The next case today is United States v. Ala Vista Panets, appeal number 191471. United States v. Gene Swierski, appeal number 191595. United States v. Christopher Leary, appeal number 191600. Good morning, counsel. Could you please identify yourself for the record? Good morning, your honors. My name is Christopher Leary, and I acquinto of Holland a night, counsel for Gene Swierski. And are you ready to proceed? I am. May it please the court. The heart of this appeal is the government's failure to prove its case on nine shipments of medicine made by an unregistered pharmacy technician, Scott Connolly. This justifies reversal of the nine corresponding mail fraud counts and the RICO charges for failure to satisfy its numerosity requirement. Earlier this month, this court touched on these issues in its opinion in United States v. Cadden. The record in this case is fundamentally different than the record there, and what supported affirmance in Cadden justifies reversal here. On the record before this court, there is no misrepresentation. The government charged Swierski with participating in a scheme in which NECC represented that it complied with Massachusetts pharmacy regulations. The district court's decisions below and the prosecution's case throughout were based on these Massachusetts pharmacy regulations. But there is no record evidence anywhere of such a representation. The government never argued and the district court never addressed whether NECC's marketing materials representation that it used certified technicians meant that technicians were registered. On this record, it does not. In the Cadden case, and as it appears in this court's opinion, Wilson Chu, a Connolly customer, testified that NECC's communications definitely led him to believe its technicians were registered. There is no testimony like that here. In fact, the only Connolly customer to testify did not receive or review any of these marketing materials. Here, there is no testimony from any Connolly customer concerning representations about Connolly's registration status. In Cadden, there were 10 counts, of which three related to the Sunrise Medical Center that Chu was the representative. But we upheld all 10 counts, even though there was no testimony as to seven of the customers. And we did that the opinion does that in part by relying on the marketing materials that Bono, is it Bono? That's correct, Your Honor. That same testimony was present here or not from Bono? So the totality of Bono's testimony makes clear that his representations concerned the quality processes as they appear in USP 797. But you testify about marketing materials making a representation about certified technicians? That is in the record here. So there were two different issues. The Bono testimony is similar, but the testimony concerns compliance with USP 797, which is silent on certification, which doesn't answer the question. In Cadden, there was a representation that Bono testified about marketing materials that included a company overview, of which one of the things in the company overview was a representation about the use of certified technicians. Is that testimony present here? My understanding was that it was. That's correct, Your Honor, it is. With respect to, could you just address then Cadden as to seven of the Connolly counts in Cadden, suggested that that testimony about that marketing material, because of its representation about certified technicians, could have permitted the inference that given how widely distributed it was, it would be fair to infer that it was received by the customers at issue, and that they could infer that that was a representation about licensure or registration. Sure. So I think to your first question, the inference that it was received by the customers at issue, I think the records are fairly consistent on that point. But unlike in Cadden, Connolly testified here that he was certified throughout his tenure at NECC, and the government concedes that point at footnote 10 of its opposition. So therefore, NECC's marketing materials were literally true as to the use of certified technicians, and the record here disproves that certification means registration. Registration requirements vary from... One possible response to that is that under NECC, there is nothing else to view a representation that we use certified technicians as a representation that they would be in compliance with whatever requirements a state licensing board required of pharmacy technicians. It's true here there was more developed evidence than in Cadden to suggest that certification might mean something else, but the jury heard all that evidence and nonetheless convicted. So why wouldn't we conclude that the general term certification or certified in the marketing materials was enough to permit the inference, and they concluded that it was intended to be false and misleading? Because I think... That's time. You can answer. Okay. I think the record here demonstrates that they're really disconnected statuses because a state registration, which is governed by the state, implemented by the state, has no bearing or input on certification itself, which is regulated by a private entity, issued by a private entity, and contains completely different requirements. So there's just a real disconnect between the two statuses, and it would... The extension of that rationale would mean that certification means different things between different states, and an individual can be certified like Corey in New York, and practice in New York as a nationally certified technician, but did so without a state registration. And so it's really the record of evidence here about the differences between the two statuses where state law has no implication on the certification process or what it means, that there's just no relationship between them. Well, isn't the implication, though, that he's representing himself to be certified and the assumption is that he can legally work in this position in Massachusetts, which is not true. Well, I don't think that's the assumption because certification really is... It's true in Massachusetts. He would not have been allowed to do what he was doing in the state of Massachusetts. That's correct, but the phrase certified technicians and the marketing materials were literally true, and I don't think that assumption carries over because the certification requirements are... To be responsive to the questions I think you're getting, the problem is that the marketing materials used a general reference to certified. Correct. It didn't say certified and then define what certified means. It just said certified. You're now saying that there is a specific way of understanding certified that would make it literally true, but the question is when you just use a general term without specifying it, whether that can be misleading because it implies something beyond that specific thing that you're saying. It might lead one to think valid to practice, and if you thought that, then it would be misleading, so what's the answer to that? Well, I think it's a capitalized term in the marketing materials, and that's a proper noun designating a particularized status, so it's not using the word certified in the general sense. It's using the attainment of that status from the pharmacy technician certification board, and there was testimony throughout the record that certification meant something different, and in fact, it means something different under state law. Certified technicians are permitted to do more than registered technicians, so in this space, there's no record evidence to support the certified in the general sense. It's really applying to that designation by the pharmacy technician certification board. Does the McHatton testimony contradict the point you just made? Because I thought his testimony was certified, licensed, all of it's together. His testimony was that he expected NECC to comply with the law irrespective of any representation or irrespective of his review of any particular marketing material or representation made. There's nothing about his testimony that says certified means registration or that he would even understand that. In fact, I think his testimony supports what I said before, that they're really separate statuses because he acknowledges that he employed, I believe, 40 pharmacy technicians. Only 37 of them were certified, so there's a real difference between what a certified technician is and can do within the state and just the mere concept of registration. Any other questions? No. Thank you, Counselor. Thank you. The next attorney we're going to hear from is Attorney Paul Kelly. Good morning, Your Honor. Good morning, Counselor. Paul Kelly on behalf of Appellant Christopher Leary. May it please the Court, since I only have five minutes, my intention is to focus on the mail fraud counts and to rely upon our written arguments as to the remaining issues. I want to first describe my client. Christopher Leary was the least experienced pharmacist at NECC. He was 28 years of age, only three years out of pharmacy school when he accepted a job at NECC. He had no prior education or training in compounding. After pharmacy school and before taking a job at NECC, he worked for a couple of years in retail pharmacy at Walgreens. You don't have a whole lot of time, and so I want to make sure that we get to at least one issue that I want to be clear about what you're arguing. Are you arguing that he was not aware of the marketing representations, or are you conceding that he was aware? I could not tell from your brief. There is no evidence in the record that he was aware of the marketing materials. In fact, I think the evidence suggests he had no contact with the sales training or marketing materials, and no awareness of the various brochures and publications that were provided to customers. Your Honor, I would say that Mr. Leary's role at NECC was that he was a checking pharmacist, as I think the court is aware, which was the fact that he was to check to make sure that the technicians who actually mixed the various stock solutions followed the formula, used the correct amount and the proper ingredients, which he did by effectively checking these weight slips, and if he determined that the formula was followed, he would simply sign off. When Mr. Leary took the job at NECC, he took a job that paid him less than the position that he had previously held at Walgreens because he was seeking a position with regular hours, and contrary to the government's claim in its brief that he derived considerable financial benefit or that he was preoccupied with financial gain, in fact, Mr. Leary earned an annual salary of approximately $100,000, less than he had earned before. He was a salaried employee with no ownership interest, no incentive bonuses, no profit sharing or other benefits. The government's assertion on page 52 of its brief that he earned $175,000 per year working at NECC is simply false, and the reference by the government to his supposed preoccupation with financial gain apparently refers to the fact that he owned a used BMW and talked about his interest in cars with a coworker. It's also important to emphasize here that the jury acquitted Mr. Leary of being part of any racketeering enterprise or conspiracy, and there was no additional evidence apart from that that was offered to establish the existence of the racketeering enterprise. I thought counsel at the Supreme Court has told us quite clearly that where there are arguably inconsistent verdicts in a criminal case, we can't take account of that, we can only look to see whether the evidence is sufficient to ground the conviction on the counts of conviction. I would agree with the court. Isn't that Supreme Court case law? Yes, it is true, Your Honor. We present the inconsistent verdicts to underscore the argument that reasonable doubt is present on each of these counts, particularly the mail fraud counts. But they don't underscore the argument because, as the Supreme Court has pointed out, assuming that they are inconsistent, and I doubt that they are in this instance because of the diverse elements of RICO, but even assuming they're inconsistent, the error made, the mistake the jury made may very well have been an acquitting on the RICO counts. You know, Your Honor, there are two counts where on identical facts... RICO counts have elements that don't have to be proven in the mail fraud counts. I understand that and he was acquitted of those counts, but the point is that they offered no additional evidence beyond the conspiracy evidence to suggest that he was a knowing or willful participant in any scheme to defraud. What is it that's missing with respect to what his knowledge is? You've said one possibility is he did not know about any of the representations that were made, so if that's true, that would be something that was missing. With respect to the basis for the misrepresentation, in other words, the failure to test, what are you saying to us about why the evidence was insufficient to show that he knew what was being said was not true, even if he knew it was being said? Well, you know, again, as the rookie pharmacist at the job, with no understanding of compounding or USP, he was knowledgeable about the fact that testing was occurring regularly. He was not provided with the results of tests. He wasn't informed by the compliance officer when they received tests that indicated a problem with sterility or potency. He had no authority or discretion to direct the... On the shipments that he's charged with the mail fraud for, and insofar as the evidence that supports that mail fraud count has to do with a misrepresentation that those shipments were tested when they were not, what does the evidence show about when the testing that was supposed to occur was supposed to have occurred? In other words, in the process for compounding, at some point there's a test done. Do we have anything in the record that tells us whether that testing would have occurred at a time before your client had signed off on the shipment, or would the testing only have occurred after, in the process he had signed off on it? The one example I can point the court to is count 32, which is one of the mail fraud counts. On that particular matter, it involves a shipment. If I could just respond to finish my answer. That involved a shipment of a medication that was sent out to a hospital on August 27th. That stock solution that was used to make that particular medication was tested on August 20th, or at least the results apparently were sent back to NECC on August 20th. Those results were never passed along to Mr. Leary, the compounding pharmacist. So at the time that he approved this formula to be shipped out to this hospital, he had every reason to believe that that stock solution had tested positively for both sterility and potency. People like Cadden and Annette Robinson, who was in charge of these matters, never attended that information, and that's what the evidence at the record showed. Given that my time has expired, your honors, for the reasons outlined in our written papers, we would respectfully ask the court to vacate Mr. Leary's convictions and enter a judgment of acquittal. Thank you. Do my colleagues have any other questions? Thank you, Counselor. Good morning, Counselor. Could you identify yourself for the record? Yes, your honor. John Henry Cunia for Alice Definites. Are you ready to proceed? I am, your honor. Okay. If your honors please, our issues are discreet from that of the prior two appellants. There are two specific issues that we present for your consideration. The first is that the evidence was insufficient to support a finding that Ms. Definites dispensed medications, and the second is that the strict liability misdemeanors should not be applied to Alice Definites and that they are, in any event, unconstitutional. I suspect I will not get to the second argument, and I therefore, if that's the case, I would rest on my brief and reply brief. As to the dispensing, it is important, as we point out in the brief, for this court to understand the way in which orders were processed at NECC. Before you go into that process, I just want to understand one legal point. Yes, your honor. As I read the statute, to be guilty of it, it's not clear to me you must be the dispenser. It seems clear that you have to introduce into commerce a mismanded drug and that a mismanded drug is one that has been dispensed improperly, but I don't see where in the statute the person who is the defendant must be the dispenser. Judge, I would direct the court to the instructions that were given to the jury in this case. Specifically, it begins on page JA6034 and extends to JA6036. In those instructions, it is clear that the court was instructing the jury that Ms. Definites had to have dispensed the drugs. So, whatever the statutory interpretation may or may not be, the instructions in this case, I would suggest, would bind the court in terms of what the jury decided. It's made most significantly clear on page JA6036 where the court instructed the jury, as with adulteration and misbranding counts, those are the counts that were applicable to co-defendants. I quote, if you find Ms. Definites guilty of dispensing a drug in interstate commerce without a valid prescription, etc., etc., it's very clear that if you read all of the instructions that the court was, in fact, saying that they needed to find that she dispensed the drug. So, to go back, if I can, Your Honor, I know I don't have a lot of time, so I want to try to go through as quickly as I can. There were three essential aspects to the processing of orders at NECC. First, they were received by fax, and then there were people that confirmed the order. They called the facility, they made sure that the medication was something that could be provided by NECC, and it was at that stage that patient names were reviewed and confirmed. The second stage would be the compounding and verification stage. Some of the drugs were already compounded, but they still would go into the clean room to fill those prescriptions. Those were for the stock drugs, and then for the custom medications, they had to be compounded at the same time, but again, that was all done in the clean rooms. It was also at that point that the medication was verified, and the record was very clear on that point with respect to the fact that when medication was found to be subpotent at Mass Eye and Ear, the Mass Board of Registration and Pharmacy requested that the verifying pharmacist respond, and the verifying pharmacist was in fact the pharmacist in the clean room who had verified the medication. At that point, the medications were packed, the vials were put in clear plastic bags, and they were sent out on a conveyor belt to the checking, the checker. It is in that third function that Alice Stepanitz acted with respect to the six strict liability misdemeanor convictions here. There was a verification sheet that she had to fill out. It was very clear what it was, what she had to determine. She had to determine essentially that the right drug in the right amount in the right quantity went to the right customer. I'd suggest that as far as dispensing is concerned, the legal and factual issues that were tried were framed by this court in the original decision. About the time? Time? You may proceed. Go ahead. Okay. This court framed the issues and noted that the government at that point, when the court was only looking to determine whether there was a valid indictment and determined that the indictment was valid, it noted that the district court had relied upon factual assumptions. One of which was a crucial assumption disputed by the government. The government stated that the person in Alice Stepanitz's position would check the patient names. In fact, that's the legal and factual scenario that was presented. Just one direct question. You made a representation. I want to understand if I get it right. For the six orders that are at issue here in the six counts, your contention is that the only, that she had no knowledge of the names of the patients used as to those six There is some evidence that she had knowledge of names of other orders. Is that right? Yeah. Is that correct? No. Yes. There was absolutely no evidence. When she had evidence of names of other problems with names, that's when she was acting in the function of a control. But those were not related to these six shipments? None of them related to these six shipments. There was no evidence before the jury that Alice Stepanitz or anybody in that position saw the patient names at the point when they were already packaged and she was just checking to make sure the right medication went to the right person or the right facility, I should say, and then she handed it literally to the people who put it in a box and shipped it. There's no indication. All of the information that was required for that purpose was contained on the invoice with one exception. And that exception is the checker had to look at the plastic bag to make sure that the label on the outside, that the lot number on that matched the lot number that you could see on the vials inside the bag. So other than that one instance, every other piece of information was on the invoice, which did not contain the patient names. There is no evidence that she saw the patient names. Thank you, Counselor. Thank you, Your Honor. Attorney Kuna, if you could mute your video and audio and we would hear now from Attorney Goldman. Good morning, Your Honors, and may it please the Court. Ross Goldman for the United States. And are you ready to proceed, Counsel? I am, Your Honor. Thank you. Go ahead. I'm happy to start anywhere the Court wants, but otherwise I'll begin where my friend on the other side left off and address the misdemeanors, misbranding convictions under the FDCA. And I think the top line point I want to make here is there was a sufficient evidentiary basis, an ample evidentiary basis from which a reasonable jury could have inferred that misdemeanors saw the patient names. And then as a secondary matter, and as a legal matter, it's not clear that that would even matter for purposes of her misdemeanor misbranding convictions. So first, the factual point. And I'm happy to offer the Court some sites to support this. But for example, in her role as a verifier, she would have had access to patient names and would have looked at patient names. One example is on page 4076 to 4077. When you say verifier, is that the role she was playing with respect to those six shipments? That's correct, Your Honor. Yes. Does that mean she was a checker the way he's just described it? So we would resist that characterization, I think, because a verifier, you know, she was a Massachusetts licensed pharmacist doing this work. And the verification that she was doing was more than the sort of ministerial clerical kind of role that my friend on the other side, I think, attributes to the label checker. The form that misdemeanors had to fill out was called the pharmacist verification check sheet or checklist. And so, but the function was really to ensure that the drugs were made correctly and indeed to check patient names. What is the, is there a record site you can give that would indicate with respect to any of those six shipments, let alone all of them, that as to that one, she saw the patient name? So it would be, it would be, there's, I don't believe that there's a direct site that points to these specific shipments. There are sites that describe generally the role of what the pharmacy verification responsibilities include. And from there, the jury could have included or could have inferred that she looked at the patient name. So for example, if I could, I could offer the court a few sites. So at page 4076 to 4077 of the joint appendix is an email exchange between Ms. Steffanitz and Kenneth Bonneau, one of the sales employees. And it's not, it doesn't, it's not obvious from the record what shipments they're talking about, but Ms. Steffanitz is emailing back to Mr. Bonneau saying, I am not going to ship this order until the patient name issue is resolved. Evidence that she would have known the patient, is there even evidence testifying that she would have known the patient name of every shipment she touched? Yes, because, because her role, again, the pharmacist, and there's an example of this at government exhibit 15 at pages 25 to 26, if the court wants to look, the verifying pharmacist completed a check sheet that required confirming the facility name, facility address, drug, the number of vials, et cetera. And at page 5201 of the record, there's testimony that that final verification sheet was, quote, coupled with the order form. The order form is the form that a customer faxes into NECC that contains, among other information, the patient names. And so this patient name form, the testimony shows, is coupled with the verification form. The person that fills out the verification form isn't responsible for ensuring anything about that attached form, are they? Well, again... The verification form doesn't require you to make any check about that, does it? There's nothing on the verification form that requires a check next to patient names, but there's evidence that checking the names was still part of the verification process. Another site I can offer, Your Honor, is page 5266 to 5267. Wait a minute. When you say coupled with, do you mean physically coupled with so that it would have been present in her hands? So that's the testimony. The testimony is just coupled with. I think our position is that the inference would be that the form is literally traveled, the two forms are traveling together through the pharmacy, through the various stages of the compounding verification and shipping process. And that's consistent with testimony from Bill Frisch, and this is at pages 5266. But what is the evidence that the person who gets the coupled forms, who is responsible for filling out the verification form, has any responsibility for saying anything about the patient name that's on the coupled form? So at 5266 to 5267 is Bill Frisch's testimony. He works for the Massachusetts Board of Registration and Pharmacy, and he's talking generally about what this final verification process entails in Massachusetts. He's not specifically talking about NACC's practices, but NACC's practices were mapped onto Massachusetts state requirements. And what he says is that the final check was, quote, required to check that the drug is based on a prescription. And again, so this testimony that the... Yes, but the testimony that we heard is that the confirmation process, which precedes the checking process that involves filling out that verification form, was the stage at which the patient name would be checked. And the contention is that Stepanitz, because she was responsible for that verification form, would not have necessarily been involved in the confirmation process about the name so that when she got the thing, it would be coupled with both. She's responsible for making sure that it's verified. Nothing requires her to know anything about the name at that point. That's not her job. That's the contention. And sure, it had to be a prescription, which meant earlier there had to be a confirmed patient for it. But she says there's no evidence I was responsible for that and didn't do it. So what's the evidence with respect to these six shipments that she was responsible for and nonetheless passed on it when it was a fictitious name? So, again, it would be an inference that would be... If Your Honor is looking for a direct piece of evidence saying, as to these six counts, did Ms. Stepanitz look at the patient names, I don't know that there's anything that direct. But what we do have is that the patient name, the evidence from which the jury could have inferred the following... Well, to do her job, she didn't necessarily then have to look at the patient name. We would disagree with that, Your Honor. Again, based on the testimony of Bill Frisch, where he testified that the final check was required to check that the drug is based on a prescription. The way that you would know it was a prescription, she was the one responsible for making sure it was one by making sure the name was real. That just means that at the end, it had to have a real name. It doesn't say who in the process was responsible for that. The thing you need to point us to is some evidence that indicates that she was the one who had to know it. Well, so what Bill Frisch is talking about is he's talking about the final check process. In other words, he's talking about the part of the process that Ms. Stepanitz fulfilled with respect to these six counts. And he's saying that as part of that process, that that person, that Massachusetts-licensed pharmacist, has to ensure that the drugs are based on a prescription. It does not say that it couldn't have been earlier deemed a prescription through confirmation of the patient name earlier in the process of verification. No, he's not disputing that. To be sure, there's no doubt that the confirmers on the front end, when the order first came in, confirmed the order and confirmed the patient names. What the evidence shows... Are we looking at this too narrowly? I mean, does prescription by definition also include verification of the patient as well as the drug? Well, so... Because for us, prescription, we're thinking about the drug itself. Verification of the drug itself and the amount, quantity, etc. But, I mean, are we looking at it too narrowly? Well, so the prescription is that plus the patient name. And the patient name, if it's a fictitious patient name, as these counts were, they're not valid prescriptions. And so, I think what I'm saying is that the evidence showed that there were checks on prescriptions both at the front end, at the confirming stage, and on the back end at the verification stage. What is the evidence of the latter point, that in NECC's process, there was confirmation, re-confirmation, that had earlier occurred of patient name? So, it's, one, I think the testimony of Bill Frisch is probative on the theory that, again, Massachusetts was mapping its process, I mean, excuse me, NECC was mapping its process onto what Massachusetts law required. And Bill Frisch is telling the jury what Massachusetts law required with respect to this verification stage. And he's saying it's required to check that the drug is based on a prescription. A drug that's written in the name of Harry Potter, or Wonder Woman, or Budweiser, is not a drug that is written based on a prescription. That would have been something that's part of her role. So, does he say that prescription also includes verification of patient name? Is his testimony that specific? So, what he testifies to is that, and this is multiple witness testifies to this, is that the prescription has to be a valid patient-specific prescription. In other words, the prescription has to be written for an actual person who is going to get the drug. And Ms. Stephens concedes, on page 18 of her brief, that these patient names associated with these six counts are, in her words, manifestly fictitious. And so, what I think, if you marry up Bill Frisch's testimony with the fact that the prescription order form that has the names on it is traveling with the verification sheet, combined with Ms. Stephens' earlier email, or unrelated to these counts email, to Kenneth Bonneau, saying, I am not going to ship this until the patient name issue is resolved, I think creates an inference. The question, again, on sufficiency review, could any reasonable jury have found, based on this evidence, that Ms. Stephens saw these names? But I do want to make, before I run out of time, a legal... Counsel, excuse me, let me just take a crack at this, because is your position that to perform the verification function, she has to find that it was based on a valid prescription, and that because she was chargeable with knowledge of these obviously fictitious names, she could not have relied on the fact that these had gone through the earliest stage of NECC's process? Well, I don't think that's exactly our argument. Our argument is a bit more, I think, straightforward, in that the jury could have inferred that  There are five minutes remaining. that they were fake, and that, therefore, the drugs were disbranded. I do want to make the legal point, though, that because, again, she was convicted only of the misdemeanor offense, which is a strict liability crime, even if she did not look at the prescriptions, she still would have been properly convicted of her role in dispensing these drugs. The Supreme Court decision in Dodd-Wyche and Park made clear that a person... I take the point. First point is, do you agree that she has to be the dispenser? I agree with Your Honor's point that the statute doesn't require that. The jury instructions did require her to be the dispenser. I mean, it depends on what part of the jury instructions you look at, Your Honor. On page 6035, the court identifies the three elements are that she caused the introduction of drugs into interstate commerce, that a valid prescription was required, and that the drugs were dispensed without a valid prescription issued by a practitioner licensed by law to administer the drug. That formulation... But there was a separate instruction that then said that they had to find she was the dispenser? So, well, what the separate instruction says is, if you find misdemeanors guilty of dispensing a drug in interstate commerce without a prescription, that instruction doesn't actually say you must find that misdemeanors is the individual who did the dispensing. In fact, the clearest articulation, I think, of what it was that misdemeanors had to do is on page 6035, where the court lays out the three elements of the offense that the government has to prove beyond a reasonable doubt. And none of those elements required the jury to find that misdemeanors herself did the dispensing. What's the government's theory of what she had to do? Suppose she was just a courier? So, it depends... I don't know the limits of what your position is. What does it mean to introduce into commerce, then? So, I think the Supreme Court's decision in Dodd-Weich answers that question. And the court in Dodd-Weich makes clear that liability is imposed on those with a responsible share in the furtherance of the transaction which the statute outlaws. So, if you were to imagine, for example, a recent high school grad who's a shipping clerk who takes the misstep and it says, okay, these are good to go. Put tape on the box and give it to the UPS guy for shipment. Maybe that high school grad who's literally taping the box and handing it over to the UPS guy doesn't have a responsible share in the furtherance of the transaction. Or, as the Supreme Court in Dodd-Weich elsewhere framed it, liability is imposed on those who at least have the opportunity of informing themselves about the existence of conditions that the statute outlaws. Maybe the downstream shipping clerk who merely tapes the box and hands it to the delivery driver doesn't have that. Misstep in it plainly does. She's a Massachusetts licensed pharmacist whose role in this process, consistent with state law, is to make sure that misbranded drugs are not being introduced into interstate commerce. So, there are, to be sure, and the Supreme Court made clear in Dodd-Weich that these strict liability crimes can impose hardships given that liability can rest even without a finding of consciousness of wrongdoing. But Dodd-Weich sets out a limiting principle. It would depend on the facts and circumstances of a particular case where that limiting principle, how it applies. But what I think is abundantly clear is that misstep in it, being a Massachusetts licensed pharmacist, falls well within the wheelhouse of what the statute is trained at preventing. I know that my time is starting to run. I would like to make just a couple of brief responsive points with respect to the other two defendants. Yes, please. Please do so. And I'll start with Mr. Svirsky. And a couple of points I want to make. One is, in the Barry Cadden trial, and in the briefing to this court in Barry Cadden, it was clear that Scott Connolly maintained his national certification. So, this was not a new piece of evidence before this jury. It's not a new piece of evidence before this court, and in particular, so the court has them, at pages 46 to 47 of the Barry Cadden trial, the transcript dated January 23, 2017, is where evidence is elicited that Scott Connolly maintained his national certification. Barry Cadden made that point at pages 83 to 84 of his opening brief, and at page 23 of his reply brief. And so, we would certainly agree with the position that this court's statement at page 15 of its opinion in Barry Cadden, that a jury could infer from the marketing materials that this was a representation about state registration status is a sound one. That same evidence to answer a question, Judge Barron, that you asked was elicited in this case through Kenneth Bonowitz at page 766 of the joint appendix. The actual marketing material is at page 7501 of the joint appendix. The last responsive point I want to make with respect to Mr. Sfirsky is there was some confusion amongst the pharmacy technicians here about what to call the requirement, the state registration requirement. So, a couple of times it was referred to as the obligation was referred to as a licensure obligation. That's at pages 1742 and 2242 of the joint appendix. Yet another instance it was called a certification with the state at page 2643. So, the idea here that we're, I think it's important not to rest so literally on the meaning of the word certified as my friend on the other side would do. And the question as I think Judge Barron intimated is really could any reasonable jury have inferred from this marking representation that this was a representation about registration status. I think the answer is plainly yes. Indeed, it's exactly the inference this court drew at page 15 of its opinion in Barry Cadden. And then I can close by just addressing a couple of responsive points with respect to Mr. Leary's argument. This idea that he had no idea about compounding or no understanding of what chapter 797 was. Massachusetts pharmacists are required by law to comply with chapter 797 and Mr. Leary was a Massachusetts licensed pharmacist. He made the point that he had no idea of the marketing materials. What is the evidence that he did? So, it would be the evidence would be an inference drawn from the fact that representations about compliance with 797 was at the centerpiece of everything that NECC did as a pharmacy. It was representations made in person by sales staff. There were representations made repeatedly in these marketing materials. And indeed it makes sense. And it makes sense from which the jury could infer. That he at his level would have been aware of what representations were being made to customers. Again, there is no direct piece of evidence that shows that Mr. Leary saw a marketing pamphlet be left with a particular customer. What there is, is overwhelming evidence that these representations about compliance with 797 were the key representation that made all of NECC's business even possible. What's the evidence that he would have known? It makes sense for someone at the level of CAD to be responsible for that marketing strategy. Why does it make sense to say that a person at this person's level would have known of the marketing strategy? The question is not whether he violated USP 797. It's whether he fraudulently represented that they complied with it. So he didn't himself make the fraudulent representation. He was part of the scheme. But what is his knowledge of the scheme? The scheme has to include knowledge of the marketing. What's the evidence that he had knowledge of the marketing strategy? It would be an inference that the jury would be entitled to draw from a couple of pieces of evidence. One is the overwhelming extent to which NECC oriented their entire business around representing compliance with 797. Plus the idea that he as a Massachusetts licensed pharmacist would have known that he has to comply with 797. Plus the idea, and again as basically every customer in this case testified to, customers would not have bought from NECC but for representations about 797. So for Mr. Leary's argument to be right, and then one final affirmative point before I pivot. His financial motive here, Mr. Leary faults our evidence on this, but it's drawn directly from the trial transcript at page 1802 to 1803. Both about his salary and that he was preoccupied with financial gain. Those are not our words. Those are the words of a pharmacy technician. Their case law is clear that that kind of intent, that sort of financial motive is a powerful indicator of an intent to defraud. To believe Mr. Leary's articulation of this, the jury, what this court would have to conclude, I think, is that the only reasonable inference that could be drawn is that a Massachusetts licensed pharmacist in this high risk compounding area would have had no idea that the pharmacy was representing compliance with 797. I think So is the same true for all of the licensed pharmacists who were there? We would impute that knowledge to every single person at that compounding facility? I think that's right and I think it's important to remember too, I mean, Mr. Leary represents that he was a rookie pharmacist and that he was, this idea that he was sort of naive and whatnot. But in a high risk compounding environment like this, the pharmacist is not a bit sort of side player in what's going on. I mean, their work is central. With respect to these particular shipments, there was an argument made to us that the evidence would have been lacking as to these particular shipments that he would have known  USP 797 because of the timing of when the evidence of the test result would have come back and when that would have been communicated to him. Can you address that? Of course, Your Honor. The evidence in the record is clear that sterility testing, which is the sort of key test here to ensure there's no contaminants in the compounded drugs, takes 14 days. These drugs and these counts were shipped either a day or two, some day, perhaps even the same day, I don't have it exactly, but no more than two days after the drugs were made and when they couldn't possibly have been tested first. And so that's the inference here. That's how the jury could have, I think, readily inferred that Mr. Leary knew. What about the evidence they point to about the August 20th one? The test result coming back August 20th. So there was a test result. The stock lot was contaminated. There was a subsequent test result that came back and showed that the drug was not contaminated. A final drug. Two points about that. One is NACC had a practice, and this is in our brief, of sending test samples that were too small and that therefore made it too small under the terms of 797. And so the sterility results that showed a sterile test result were not reliable because the sample size was not big enough from which the testing company could make a reliable determination of sterility. The other point is it doesn't matter. The fraud here with respect to Mr. Leary was not knowingly shipping contaminated drugs. The fraud was knowingly shipping drugs without them having been tested as sterile first. Another point that I just want to make that's, I think, partly at least responsive to Judge Berenstein your question. Mr. Leary says that he had no idea that the drugs were ever tested as contaminated in the first place. And the jury could have inferred otherwise at pages 2772 to 2773 of the joint appendix. Annette Robinson is testifying. And she's the person who at this point was sort of in charge of facilitating NACC's testing program. And she testified that she quote, always told pharmacists when a non-sterile result came back. And so those results went back into the clean room. The jury could have inferred Mr. Leary knew if even it mattered. And again, I don't think it does because the theory of the fraud exactly the theory of the fraud that this court in the Barry is knowingly shipping drugs in violation of 797 contrary to representations made about compliance with 797. Do my colleagues have any other questions? Otherwise I will thank counsel. Thank you. Thank you, your honors. That concludes argument in this case. Attorney Cunha, Attorney Iacquinto, Attorney Kelly, and Attorney Goldman, you should disconnect from the hearing at this time.